In re AIR CRASH DISASTER NEAR
SILVER PLUME, COLORADO, ON
OCTOBER 2, 1970.

MDL No. 112.

United States District Court,
D. Kansas.

Oct. 6, 1977.

Lawrence J. Galardi, Magana & Cathcart, Los Angeles, Cal., Co-liaison Attys., for plaintiffs.

Frank W. Granito, Jr., Speiser, Shumate, Geoghan & Krause, New York City, for plaintiffs.

James P. Buchele, U. S. Atty., Wichita, Kan., Jonathan Hoffman and Michael J. Panjia, U. S. Dept. of Justice, Washington, D. C., for defendants.

Paul K. Swartz, Martin, Pringle, Schell & Fair, Wichita, Kan., for Wichita University.

## OPINION OF THE COURT WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

THEIS, District Judge.

Before the Court in this multidistrict action are seventeen cases consolidated for pretrial proceedings and determination as to the legal issue of liability between the parties. All cases, as captioned in Appendix I attached hereto, either were originally filed in this court or were transferred here for consolidated pretrial proceedings by Order of the Judicial Panel for Multidistrict Litigation, entered on December 5, 1972. Subsequently, by stipulation of the parties in the Final Pretrial Order herein, it was agreed the liability issues as concern the liability of the United States and the liability, if any, of Wichita State University and the State of Kansas as an alleged tortfeasor to the United States as an alleged co-tortfeasor under the third-party complaint, be first tried and determined by this Court. Plaintiffs herein are suing the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., for recovery of damages for injuries and deaths resulting from the crash of a Martin 404 aircraft on October 2, 1970, in the vicinity of Silver Plume, Colorado. The United States, while denying any liability to plaintiffs, has also filed a third-party complaint against the State of Kansas and Wichita State University. After considerable delay of several years, due principally to the severe illness of a material witness, discovery was completed so the case could be tried. At trial to the Court, the parties presented evidence as to plaintiffs' two extant causes of action against the United States, and as to defendant's third-party claim against the State of Kansas.

As their first cause of action, plaintiffs allege defendant United States negligently enforced Federal Aviation regulations and negligently investigated possible violations of such regulations, thus proximately causing the injuries and deaths of which plaintiffs here complain. Defendant alleges plaintiffs' claim is barred by the discretionary exemption to the Federal Tort Claims Act, and even were it not so barred, defendant's employees did not behave in a negligent manner. Defendant also contends the Federal Aviation Administration owed no actionable duty to plaintiffs herein under applicable state law.

Plaintiffs also contend as a separate cause of action against the United States that an Authorized Inspector (AI), while acting in the cause and scope of employment for the United States, carelessly and negligently inspected, examined, tested, licensed and certified as airworthy the aircraft, when in fact such aircraft was not airworthy but unfit and unsafe to fly, thus proximately causing plaintiffs' damages. Defendant alleges the Authorized Inspector was not an employee of the United States, that even if he were an employee the cause of action would be barred by the misrepresentation exception to the Federal Tort Claims Act; that such inspector did not behave negligently, and even if he did such negligence was not a proximate cause of the air crash.

Defendant, in its third-party claim, alleges the State of Kansas, through its public corporation, Wichita State University, was actively negligent in the selection of Golden Eagle Aviation, Inc., who supplied the aircraft, crew, and services, and in the conduct of the University's aviation transportation operations, and such negligence was a proximate cause of plaintiffs' damages. Defendant therefore alleges if it is found liable to plaintiffs, such negligence giving rise to liability is merely passive and defendant is entitled to indemnification from third-party defendants. Third-party defendants deny negligence, contend even if they were negligent as alleged, such would be only passive negligence, and assert indemnification in favor of the United States is not rationally justified as a matter of justice, equity or public policy.

After trial of the liability issue of this action and after considering the evidence, the credibility of witnesses, and the excellent briefs of counsel, the Court has made certain Findings of Fact, Conclusions of Law, and Opinion of the Court, as hereinafter set forth. For the purposes of brevity

and convenience of composition, certain abbreviations or shortened titles are frequently used herein as follows:

"FAA" means and refers to the Federal Aviation Administration;

"FAR" or "FAR'S" means and refers to Federal Aviation Regulations;

"GADO" means and refers to a General Aviation District Office;

"Golden Eagle" refers to Golden Eagle Aviation, Inc., a corporation;

"Western Electric" refers to Western Electric Company, a corporation.

## FINDINGS OF FACT

1. At all times relevant to this case, the Federal Aviation Administration maintained a General Aviation District Office at both Oklahoma City, Oklahoma, and Wichita, Kansas; an Air Carrier District Office at Fort Worth, Texas; offices of Federal Aviation Administration Regional Counsel at Kansas City, Kansas, and Fort Worth, Texas; and an office of Legal Counsel at the Federal Aviation Administration Aeronautical Center, at Oklahoma City, Oklahoma.

2. At all times relevant to events discussed herein, the following persons were employees of the Federal Aviation Administration (FAA) and were acting in the course and scope of their employment: (a) Melvin Hanson; (b) Billie Lee Abram; (c) Norman H. Plummer; (d) F. C. Woodruff.

3. At all times relevant to this case, Billie Lee Abram was the Chief of the General Aviation District Office (hereinafter referred to as "GADO"), of the Federal Aviation Administration, Wichita, Kansas; Melvin Hanson was the Chief of the GADO at Oklahoma City, Oklahoma; Norman H. Plummer was the Regional Counsel of the Federal Aviation Administration, with offices at Fort Worth, Texas; and F. C. Woodruff was a member of the legal staff of the FAA Aeronautical Center in Oklahoma City.

4. Golden Eagle Aviation, Inc. (hereinafter referred to as "Golden Eagle"), was incorporated on November 26, 1969, by John Kennedy, Bruce Danielson, and Ronald Skipper. During the period relevant to the events of this litigation, Skipper was President of Golden Eagle, Danielson was Vice-President and Secretary-Treasurer, and Kennedy was Vice-President of Operations.

5. On November 13, 1969, Golden Eagle applied to the FAA in Oklahoma City for an air taxi/commercial operator certificate under Part 135 of the Federal Aviation Regulations.

6. The FAA approved the Golden Eagle application on November 21, 1969.

7. Golden Eagle's air taxi/commercial operator certificate entitled the company to engage in interstate commerce by furnishing both crew and an aircraft having a maximum gross weight not in excess of 12,500 pounds to another for compensation or hire. In order to engage in interstate commerce by furnishing for hire a crew and a plane in excess of 12,500 pounds, Golden Eagle would have had to qualify for and receive a commercial operator's certificate under Part 121 of the Federal Aviation Regulations. At no time herein did Golden Eagle possess a commercial operator's certificate under Part 121.

8. As individuals, Skipper, Danielson, and Kennedy were each properly certificated and qualified under Part 61 to pilot large aircraft.

9. A large aircraft is defined as any aircraft of more than 12,500 pounds, maximum certificated take-off weight.

10. A person may lease a large aircraft to another without having to comply with Part 121 certification requirements of the Federal Aviation Regulations. Likewise, a pilot who is properly certificated and rated under Part 61 may operate a large aircraft without having to comply with the Part 121 certification requirements of the Federal Aviation Regulations. However, a person who furnishes both the crew and a large aircraft to another for compensation or hire is deemed to be the aircraft operator and must possess a Part 121 commercial operator's certificate.

11. In late 1969 and in 1970, the principals of Golden Eagle were primarily interested in acquiring air mail routes under

their air taxi certificate. They placed bids for air mail contracts, but were not awarded a contract until the summer of 1970.

12. While attempting to obtain a lucrative air mail contract under its air taxi certification, Golden Eagle placed an advertisement in the Oklahoma City telephone directory in order to generate some immediate cash flow. Such advertisement stated in part:

"GOLDEN EAGLE AVIATION
Aviation Consultants & Commercial Operators
Airlines—Travel Clubs—Airtaxi
Aviation Services
Pilots—Stewardess—Maintenance
Aviation Insurance Consultants—Air Ambulance
Call for Any Aviation Needs."

13. Pursuant to the above advertisement, principals of Golden Eagle at various times acted as "aviation consultants," assisting third parties in locating pilots and aircraft for private or commercial use. The pilots located in most instances before the Court were also principals or employees of Golden Eagle. The aircraft located and flown for third persons by Golden Eagle personnel in all instances proved to the Court were large aircraft.

14. Golden Eagle was not required to hold any FAA certificate in order to engage in consulting services to potential users of large aircraft, or to supply flight crew members to operators of large aircraft.

15. On November 23, 1969, the principals of Golden Eagle flew a DC–3 into the Wichita Airport, purchased fuel under the name "Golden Eagle," and attended a Wichita State University football game. At that time they discussed with representatives of Wichita State University, Golden Eagle's role in organizing transportation for the University basketball team during the 1969–1970 season.

16. Abram, the Chief of the Wichita GADO, reported to the Oklahoma City GADO that Golden Eagle personnel had flown a large aircraft into Wichita although Golden Eagle was only certified to commercially operate small aircraft for hire. On November 24, 1969, Melvin R. Hanson, Chief of Oklahoma City GADO, wrote to Golden Eagle to ascertain facts about the previous day's flight in order to determine whether there were any indications of illegality.

17. On November 25, 1969, Danielson, of Golden Eagle, replied to Hanson's letter informing him the purposes of the November 23rd flight were to add a rating to Kennedy's and Danielson's licenses, to negotiate a little business in Wichita, and to have the pleasure of attending a football game.

18. No passengers or cargo were carried on the November 23, 1969, flight, and therefore Federal Aviation Regulations requiring Part 121 certification for operation for hire of a large aircraft such as the DC–3 were not violated.

19. Golden Eagle entered into an agreement with Wichita State University, dated November 22, 1969, to transport the University basketball team during the 1969–1970 basketball season. In that agreement Golden Eagle agreed to provide Wichita State University with two pilots properly qualified to operate DC–3 type aircraft, one female stewardess, fuel, oil, ground services, and meals for nineteen passengers on twelve separate occasions, and to transport the passengers to the nearest suitable airport most convenient to Wichita State University requirements. Wichita State agreed to pay Golden Eagle for the service according to a schedule set forth in the agreement. This agreement was signed by Ronald G. Skipper, of Golden Eagle, and Robert P. Kirkpatrick, of Wichita State University.

20. Prior to signing the agreement with Golden Eagle, Wichita State University did not investigate the legal status or qualifications of either Golden Eagle or the personnel of Golden Eagle who would fly as pilots. Wichita State did not independently investigate the ownership of the aircraft used nor check the physical condition of such aircraft prior to use thereof for transportation of University team members.

21. Through the efforts of Golden Eagle, Wichita State University also entered into an agreement, dated November 22, 1969, with Aero Data Link, a company formed and operated by John Kennedy, a

vice-president of Golden Eagle, for the lease of an aircraft for the 1969–1970 basketball season.

22. Wichita State University later entered into an agreement with Jack Richards Aircraft Company, Inc., dated November 25, 1969, to lease a Douglas DC–3 aircraft to the University for the 1969–1970 basketball season. This lease was sent to the University by Golden Eagle to replace the Aero Data Link lease. Bruce Danielson, of Golden Eagle, explained by letter to the University that Golden Eagle's attorney advised substitution of aircraft leases was necessary "to keep peace with the Feds," and the University should "destroy" the old lease. The new lease was signed by Jack Richards and Robert Kirkpatrick.

23. On December 3, 1969, Skipper and Danielson piloted a DC–3 from Wichita to Las Cruces, New Mexico, and back, carrying members of the Wichita State University basketball team. Upon reporting into Wichita Flight Service, the pilots used the name "Shocker" and an erroneous flight number to identify the aircraft. Flight Service personnel called Abram, who personally went to the aircraft and talked with Skipper and Danielson.

24. Abram talked with the pilots but other than briefly viewing the lease and service contract, did not investigate the contractual arrangements whereby Golden Eagle personnel were piloting a large aircraft for hire and carrying passengers. Abram did, however, call Hanson at Oklahoma City GADO to report the incident. He indicated to Hanson that Wichita State University was the operator of the flight, having separately leased the aircraft which Golden Eagle personnel were piloting.

25. Hanson lectured Skipper, Danielson and Kennedy to disassociate the name of Golden Eagle from large aircraft operations, although he admitted they could, as properly licensed individuals, pilot such aircraft if the plane were separately leased by the operator.

26. On or about April 6, 1970, Golden Eagle provided a flight crew to the Western Electric Company to pilot and provide maintenance for a DC–6A freighter carrying Western Electric cargo during a trucker's strike. Golden Eagle also located the aircraft and provided the aircraft leases to Western Electric. Western Electric arranged with Golden Eagle for the total cost of the flight operation, including the cost of plane rental.

27. The above referenced transaction for lease of the DC–6A aircraft by Western Electric was made between Western Electric and Aero Data Link.

28. The agreement between Western Electric and Aero Data Link was dated April 6, 1970, and signed with the name Donald Pinger, d/b/a Aero Data Link. Donald Pinger, a friend of Golden Eagle principals, never saw nor signed such document. On or about April 11, 1970, however, Kennedy, of Golden Eagle, asked Pinger, who became an employee of Golden Eagle at about that date, to allow business of Aero Data Link to be transacted in Pinger's name rather than Kennedy's. Pinger agreed and thereafter opened a post office box and bank account in Indianapolis, Indiana in the name of Aero Data Link, which account was never used. An Oklahoma City bank account and post office box were also opened in Oklahoma City for Aero Data Link. Pinger also personally signed several contracts between Western Electric and Aero Data Link for lease of aircraft, and signed several blank contracts and checks at Kennedy's request after Pinger left the Oklahoma City area on or about April 28, 1970. Pinger never received any compensation from Kennedy or Golden Eagle personnel for use of his name, or from Western Electric for leasing the aircraft.

29. Aero Data Link leased the DC–6A aircraft involved in the April 6, 1970, contract with Western Electric from Concare Aircraft Leasing Corporation of Tulsa, Oklahoma. That lease was signed for Aero Data Link by John P. Kennedy, d/b/a Aero Data Link of Huntington, New York.

30. The agreements dated April 6, 1970, between Western Electric and Golden Eagle, and Western Electric and Aero Data

Link were formally entered into after April 6th and backdated.

31. Western Electric paid separate checks to Golden Eagle and Aero Data Link. However, Pinger, who was supposedly doing business as Aero Data Link, personally received no money from the checks. Concare was paid by check from Aero Data Link, but these payments were actually arranged and executed by Golden Eagle personnel after obtaining Pinger's signature on blank checks.

32. A letter to Western Electric, purportedly dated April 11, 1970, and purportedly signed by Pinger, d/b/a Aero Data Link, was in fact not written or signed by Pinger. The letter is a misrepresentation of Pinger's and Aero Data Link's true role in the leasing of the plane which Golden Eagle flew for Western Electric on or about April 6, 1970.

33. After preliminary correspondence, on April 24, 1970, Bert Katzenmeyer, temporary Athletic Director at Wichita State University, accepted by letter Golden Eagle's bid outlining the total cost for transportation, including the aircraft lease and services, for five road games in the fall of 1970. On the same day Katzenmeyer further informed Danielson, of Golden Eagle, that a sixth game had been scheduled at College Station, Texas, for which transportation would be needed.

34. In middle or late April, 1970, Rick Meyers and John Whitehead, two pilots residing in Oklahoma City, heard that Golden Eagle had recently operated a DC–6, utilizing Richard Holden as a crew member and David Barnholtz as flight engineer, when Holden and Barnholtz were unqualified to act in those functions. Furthermore, Golden Eagle was not qualified to operate large aircraft for hire. Meyers and Whitehead reported this information to FAA inspectors Hanson and Crocker, of the Oklahoma City GADO. They were thanked and told that the matter would be investigated.

35. Shortly thereafter, Inspector Crocker requested Richard Holden to appear at the GADO office on May 1, 1970. Holden appeared on that date and was interviewed by GADO Chief Hanson, but refused to give a written statement at that time.

36. Holden composed a written statement dated May 5, 1970, outlining his involvement with a flight April 9, 1970, from Oklahoma City to Omaha, Nebraska, and then Columbus, Ohio. He stated he was employed by Golden Eagle to crew a DC–6A separately leased by Western Electric for purposes of carrying cargo for Western Electric. This statement was received by the FAA on May 16, 1970.

37. On or about May 1, 1970, Hanson received a report from an Air Carrier Inspector in Memphis, Tennessee, that Golden Eagle was operating a DC–6 into Memphis.

38. On or about May 3, 1970, Golden Eagle principals met with Hanson to discuss their contractual relationship with Western Electric. They stated Western Electric had leased the plane separately and had arranged for Golden Eagle to provide only the crew. They furnished Hanson a copy of the service agreement between Golden Eagle and Western Electric. Hanson informed them he could not render an opinion on the legality of the operation under Federal Air Regulations, but would send the contract to an FAA legal adviser

39. On May 22, 1970, Hanson sent a copy of the Western Electric-Golden Eagle service agreement to Donald W. Loftin, a Regional FAA Enforcement Specialist, for further investigation.

40. On May 27, 1970, Loftin's office obtained further factual information about the ownership of the aircraft utilized by Golden Eagle and Western Electric.

41. On June 2, 1970, Loftin's office wrote to Regional Counsel, requesting a legal opinion on the facts which had been obtained at that time.

42. On June 3, 1970, Danielson, of Golden Eagle, wrote Farmer, of Wichita State University, submitting "a proposal and recommendation for charter air service year 1969–1970 basketball road games." (Danielson mistakenly stated 1969–1970, although he intended 1970–1971.) The letter

stated: "Aero-Data-Link has been contacted and they have agreed to lease to you for your road games a Martin–404 type aircraft."

43. On June 4, 1970, FAA Regional Counsel, Plummer, wrote to Regional Flight Standards, saying it was necessary to obtain a copy of the aircraft lease between Western Electric and Aero Data Link in order to render a legal opinion. In addition, Plummer requested Flight Standards to obtain a copy of the lease or sales agreement between Concare Leasing and Aero Data Link.

44. The principals of Golden Eagle were requested to provide copies of the leases, but claimed to have no copies, and also claimed Pinger, the alleged principal of Aero Data Link, was unavailable.

45. On July 21, 1970, Golden Eagle and Wichita State University entered into an aviation services agreement for the transportation of the University football team for the fall of 1970. That agreement specified Wichita State would lease an aircraft from a third party and Golden Eagle would provide a fully qualified flight crew. In addition, Golden Eagle agreed to provide certain inflight catering services, cabin attendants, and to supply fuel, oil and routine maintenance for the aircraft. The agreement also stated the University would provide for passenger liability insurance to comply with FAA and CAB regulations. This agreement was signed by Bruce Danielson, of Golden Eagle, and Bert Katzenmeyer, of Wichita State University. The agreement was drafted by Golden Eagle's attorney. Under the agreement, Wichita State paid one check to Golden Eagle for the cost of the entire flight, and Golden Eagle then paid Jack Richards for the lease of the aircraft, and also paid any amounts due crew members.

46. In 1970, the FAA initiated enforcement action in the form of "Notice of Proposed Certificate Action" against Leland Everett, an employee of Golden Eagle. This action to suspend Everett's airline transport pilot rating was initiated because Everett had been denied a medical certificate in October of 1969, on the basis of a character or behavior disorder.

47. On August 7, 1970, Woodruff, a member of the legal staff of the FAA Aeronautical Center in Oklahoma City, served the notice of proposed certificate action upon Everett in the offices of Golden Eagle, with Skipper and another Golden Eagle official present. Woodruff informed Skipper and Everett that at that time Everett had no valid medical certificate and could not legally be used by Golden Eagle as a pilot. At Skipper's inquiry, Woodruff said he did not then know of any enforcement action against Golden Eagle for previous use of Everett as a pilot, but that any subsequent use would be illegal.

48. Everett requested an informal conference upon the proposed suspension of his airline transport pilot rating in which he could present new evidence. He also reapplied for a medical certificate. On September 30, 1970, Woodruff was advised by the FAA Flight Surgeon that Everett's medical certificate would again be denied on the basis of a character or behavior disorder, and he was also informed the FAA intended to immediately issue an order suspending Everett's airline transport rating. This was not actually done, however, until an emergency order suspending Everett's rating was issued October 8, 1970.

49. Wichita State University intended to utilize a DC–6 aircraft for the 1970 football season. Through services of Golden Eagle in locating the aircraft and sending Wichita State the lease to be signed, such an aircraft was initially leased from Jack Richards Aircraft Company. However, Jack Richards' DC–6 was severely damaged by a windstorm, so Richards agreed to substitute two Martin 404 aircraft until the DC–6 was repaired. Individual trip leases were prepared for execution prior to each trip with the Martin 404's.

50. On July 23, 1970, the Oklahoma City GADO obtained and forwarded a copy of the aircraft lease agreement between Concare Aircraft Leasing Corporation and John P. Kennedy, d/b/a Aero Data Link of Huntington, New York. However, the

FAA was still unable to obtain a copy of the lease between Aero Data Link and Western Electric.

51. On August 12, 1970, Kennedy mailed a copy of the lease between Aero Data Link and Western Electric to Hanson of the FAA. The lease was received by Hanson on August 14, 1970, and was forwarded to Regional Counsel the same day.

52. On August 14, 1970, Abram, Chief of Wichita GADO, became aware of a flyer distributed by Wichita State concerning a proposed trip upon which persons could obtain air transportation to College Station, Texas, for the Wichita State-Texas A&M football game in return for a $60.00 "donation."

53. Immediately upon receiving this flyer, Abram called Floyd Farmer, of Wichita State, to ascertain further facts about the proposed trip. Farmer told Abram the proposed trip was a Golden Eagle operation.

54. Abram contacted the GADO office in Oklahoma City and determined Golden Eagle had no Part 121 certificate allowing it to operate large aircraft carrying passengers for hire.

55. Abram also consulted FAA Regional Counsel in Kansas City as to the legality of the operation and what steps he should take. Counsel authorized Abram to contact the University and tell them the proposed flight might be a violation of regulations.

56. On the same day, Abram called Farmer, of Wichita State, and advised him the trip proposed by the flyer might be a violation of the regulations. Abram did not specifically advise Farmer the reason the trip might be a violation of regulations was because Golden Eagle was not certificated to operate large aircraft for hire, although this was the basis for Abram's opinion. Farmer told Abram the trip to College Station as advertised in the flyer, was off.

57. The trip proposal, as distinguished from the actual operation of an aircraft, did not constitute a violation of regulations.

58. In view of Abram's knowledge of the December 3, 1969 Golden Eagle flight, and his knowledge of Golden Eagle's certification under Part 135 and not Part 121 of the Federal Aviation Regulations, Abram was negligent in not further pursuing his investigation of the proposed Wichita State trip to College Station, Texas, and the contractual arrangements therefor.

59. Abram sent a copy of the flyer, together with his inspection and surveillance report, to Hanson, in Oklahoma City. Hanson, in turn, forwarded the flyer through channels to Regional Counsel in Ft. Worth for additional background information.

60. On August 20, 1970, FAA Regional Counsel Plummer, having analyzed the specific information contained in the leases and service agreements with Western Electric, expressed the opinion those documents indicated Golden Eagle had, in effect, been the operator of the aircraft leased to Western Electric, and therefore a Part 121 commercial operator certificate was required for any operation undertaken pursuant to the contracts. Plummer based his opinion primarily upon the service agreement between Western Electric and Golden Eagle, stating in his legal document that "when all the provisions of the agreement are considered together and in context, the agreement constitutes an arrangement whereby Golden Eagle provides virtually the same type of aviation transportation services that a commercial operator provides when duly certificated."

61. Plummer's opinion was forwarded to Oklahoma City GADO with the instructions: "Please take appropriate action." In 1970, the responsibility for investigating suspected violations of Part 121 was vested in Air Carrier District Offices. Therefore, Hanson's office forwarded Plummer's legal opinion to the Air Carrier District Office in Ft. Worth, Texas, for purposes of investigation.

62. In August, 1970, the Air Carrier District Office still needed to obtain additional facts to ascertain sufficient and admissible evidence to determine whether Golden Eagle had in fact violated regulations by its Western Electric operation. By reason of Holden's statement, the FAA had some

proof a flight had taken place under the contract between Western Electric and Golden Eagle on April 9, 1970, but the specific functions actually performed by Golden Eagle for Western Electric on that and other flights needed to be proved by records, receipts, evidence of payments, etc.

63. On August 31, 1970, pursuant to FAA policy guidelines for letters of investigation, such a letter was written by the Air Carrier District Office to the President of Golden Eagle, informing him Golden Eagle's arrangement with Western Electric appeared to be in violation of the Federal Aviation Act of 1958 and Part 121 of the Federal Aviation Regulations. The FAA further advised Golden Eagle the matter was under investigation and Golden Eagle would be given an opportunity to present any evidence or statements in its behalf within twenty days.

64. On September 3, 1970, representatives of the Air Carrier District Office met with representatives of Western Electric. Western Electric's representatives stated the contractual arrangements with Golden Eagle had been investigated by Western Electric attorneys and were approved by the Company's legal department. They took the position the contractual arrangement between Western Electric and Golden Eagle was not in violation of the Federal Aviation Regulations because Western Electric had maintained operational control of the aircraft. The FAA requested Western Electric to make available all cancelled checks payable to Golden Eagle, as well as any contract or lease agreement relating to the subject operation. Additionally, it was requested that Western Electric submit a statement regarding the entire relationship between Golden Eagle and Western Electric. Western Electric's representatives stated they would make necessary arrangements to obtain this material and a statement would be forwarded.

65. On September 8, 1970, the FAA Air Carrier District Office wrote to the legal and patent division of Western Electric in New York, stating Western Electric could aid in the FAA's effort to determine whether or not a violation had been committed by furnishing certain specific documents.

66. On September 11, 1970, an attorney for Western Electric sent a copy of Western's agreement with Golden Eagle and stated other documents would be furnished shortly.

67. On September 15, 1970, Golden Eagle wrote to the Air Carrier District Office of the FAA and asserted operational control of the DC–6A had remained with Western Electric at all times. Golden Eagle stated it had acted as Aviation Consultant to assist Western Electric in locating a plane which Western Electric leased, in furnishing services for the aircraft, and in locating qualified crew members who acted as individual contractors although payment was made through Golden Eagle. Golden Eagle asserted that control of destinations, times of departure, and cargo loads, remained with Western Electric at all times. Golden Eagle contended it had in no way violated Federal Aviation Regulations.

68. On September 29, 1970, the FAA Air Carrier District Office wrote to Western Electric's attorney, stating it had not yet received the documents it had requested both by letter and telephone. The FAA requested Western Electric's help in expediting those documents. The documents were not sent by Western Electric to the FAA Air Carrier District Office until October 5, 1970.

69. On the morning of October 2, 1970, pursuant to the aviation services agreement between Golden Eagle and Wichita State, two Martin 404 aircraft, registration numbers N464M and N470M, were ferried from Oklahoma City, Oklahoma to Wichita, Kansas, for the purpose of carrying members of the Wichita State football team, coaches, and several football fans from Wichita to Logan, Utah, for a scheduled game, and back again to Wichita.

70. N464M arrived at Wichita, Kansas, on the morning of October 2, 1970, at 8:50 Central Daylight time, 7:50 Mountain Daylight time.

71. Catering supplies and football gear were placed on board the aircraft on its arrival in Wichita, Kansas, and the passengers boarded the aircraft.

72. N464M carried thirty-six passengers and a crew of three, including a pilot, co-pilot and stewardess, together with a friend of the crew, who was to serve as an additional assistant stewardess.

73. Five gallons of oil were added to each engine supply tank of aircraft N464M, at Wichita, Kansas, on October 2, 1970.

74. The pilot in command of N464M on October 2, 1970, was Danny E. Crocker, and the co-pilot was Ronald Skipper, President of Golden Eagle.

75. At all material times, Danny E. Crocker, age 27, possessed Airline Transport Pilot Certificate No. 1625375, with ratings for airplane multi-engine land, DC–3, DC–6, DC–7, and commercial privileges for Martin 202 and Martin 404 aircraft, and airplane single engine land. He also held a Flight Instructor's Certificate for airplanes and instruments, which had expired April 30, 1969, and a Mechanic's Certificate No. 2014532, with airframe and powerplant ratings. He held a First Class Medical Certificate, issued by the FAA on August 21, 1970, with no limitations. He had accumulated approximately 2,452 total flying hours, of which 123 were in Martin 404 equipment.

76. Captain Danny E. Crocker received a Martin 404 type rating for his Commercial Pilot's Certificate on April 4, 1969.

77. Co-pilot Ronald G. Skipper, age 35, possessed Airline Transport Pilot Certificate No. 1429879, with ratings for airplane multi-engine land, DC–3, and commercial privileges for airplane single engine land. He also held a Flight Instructor's Certificate for airplane and instruments, which expired January 31, 1969. He held a First Class Medical Certificate, issued by the FAA on July 27, 1970, with the limitation: "holder shall wear correcting glasses while exercising the privileges of his Airman's Certificate." Ronald Skipper was not type rated in the Martin 404.

78. The pilot in command of N464M was required to possess a Martin 404 type rating pursuant to the provisions of 14 C.F.R. § 61.16(a)(1) (1970), but the co-pilot was not.

79. Aircraft N464M was a Martin 404, Serial No. 14151, with two Pratt and Whitney R2800 CB–3 engines and Hamilton standard 43E60–311 propellers.

80. N464M was manufactured by the Glenn L. Martin Company and sold to Eastern Airlines on March 21, 1952. Eastern sold N464M to Mohawk Airlines in August of 1961.

81. Mohawk Airlines sold N464M to Ozark Airlines in December of 1965.

82. On June 12, 1967, Ozark Airlines sold N464M to Fairchild Hiller. The aircraft was placed in storage at Las Vegas, Nevada, where it remained until it was sold to Jack Richards Aircraft Company.

83. Fairchild Hiller sold N464M to Jack Richards Aircraft Company of Oklahoma City, Oklahoma, on February 16, 1968 in an "as is" condition.

84. On October 2, 1970, total time on the airframe of N464M was 38,593 hours, 26 minutes; time since overhaul of the left engine was 1,011 hours, 5 minutes, and time since overhaul on the right engine 1,747 hours, 14 minutes.

85. On October 2, 1970, aircraft N464M and N470M were owned by Jack Richards Company, Oklahoma City, Oklahoma. The principals of Golden Eagle had no ownership interest in Jack Richards Aircraft Company, nor did principals of Jack Richards Aircraft Company have ownership interest in Golden Eagle Aviation, Inc.

86. Donald Sizemore, a certificated mechanic with airframe (A) and Powerplant (P) and authorized inspector (AI) ratings, performed an annual inspection on N464M at Las Vegas, Nevada, approximately one month prior to the date of the accident. In order that the plane's airworthiness certificate remain valid the FAA required such inspection by a duly authorized AI and his certification as a result of such inspection that the aircraft was found to be in airworthy condition and approved to return to service.

87. Airworthiness certificates, which only the FAA Administrator or his representatives are empowered to issue, are issued at the time a new aircraft is manufactured, except for certain minor instances not herein relevant.

■ 88. An AI, after conducting the annual inspection of an aircraft, does not issue or reissue an airworthiness certificate—he merely certifies in the aircraft maintenance records that in his inspection he found the aircraft to be in airworthy condition and therefore approves it for return to service. Without such inspection and certification, the airworthiness certificate is invalid, although it may physically remain in the aircraft.

89. The FAA does not furnish AI's their tools, equipment, job training, or a place to work.

90. The FAA does not pay nor otherwise compensate AI's for performing annual inspections of aircraft. Sizemore was compensated by Jack Richards Aircraft, and not by the FAA for his annual inspection of N464M. The FAA received no part of the fee paid Sizemore by Richards for performing the required inspection.

91. At all material times, AI's were entitled to perform annual inspections wherever and whenever they chose, so long as an AI performed enough inspections each year to maintain his rating. At all material times, AI's were not required to notify the FAA when they were performing, or had completed, an annual inspection.

92. An applicant for AI rating who meets FAA eligibility and experience requirements and passes certain oral, written and practical tests, is entitled as of right to an AI license. If he continues to fulfill certain minimal requirements the FAA provides for automatic renewal of his license without retesting.

93. Sizemore's work was required to be carried out according to specific and detailed standards established by FAA regulations as supplemented and explained in FAA brochures, guidelines and airworthiness directives furnished by the FAA.

Some FAA advisory circulars are free to AI's, while others are provided at the AI's expense.

94. The FAA exercised some indirect supervision over Sizemore's work product. His work was subject to review and supervision by FAA officials at any time.

95. Records of major repairs and alterations and a copy of the list of any unairworthy discrepancies found during the annual inspection are to be forwarded by the AI to the FAA.

96. If an AI does not perform his work in accordance with detailed regulations, the FAA can charge him with such failure and terminate his license to perform such inspections. The AI can normally demand hearing upon such charge prior to revocation of his license, unless there is an emergency revocation.

97. The FAA, pursuant to statutory authority, delegated to AI's the authority to conduct annual inspections to relieve the burden on FAA paid employees. Prior to 1956 most aircraft annual inspections were performed by Federal CAB inspectors.

98. In his annual inspection of N464M, Sizemore failed to perform the most accurate method of compression check upon the engines. However, the method he did use, while the engines were cold, showed satisfactory readings. If an engine is tested cold and shows satisfactory compression readings, it is not necessary to warm the engine or to borescope the cylinders for more accurate readings.

99. In his inspection, Sizemore also failed to perform a landing gear retraction test; failed to examine X-rays of the engine mount prior to signing off the logbooks, although he did in fact see such X-rays at a later time prior to October 2, 1970; failed to perform a fabric check on the rudder; and failed to report the absent and useless seatbelts on the plane.

100. Sizemore did not report the condition of seatbelts he found in an unairworthy condition because Richards had agreed to replace the seatbelts before the plane went into service. This is not, however, a

proper reason for Sizemore's failure to list and require repair of faulty seatbelts before certification.

101. After Sizemore's inspection of N464M at Las Vegas, Nevada, but prior to X-raying of engine mounts which would take place in Oklahoma City, Oklahoma, on September 11, 1970, the FAA issued a special airworthiness certificate for N464M with operating limitations for a ferry flight. Sizemore later signed and returned to Richards the aircraft maintenance records in which he certified the aircraft as airworthy and approved it for return to service, thus re-validating the initial airworthiness certificate for N464M.

102. Even if the FAA had known of Sizemore's negligence in failing to fulfill regulations governing his annual inspection of N464M, and had issued an emergency revocation of N464M's aircraft airworthiness certificate, such revocation would have only prevented this specific aircraft from being flown. Golden Eagle could still have operated the flight on October 2, 1970, using a different aircraft.

103. The crew of N464M performed all appropriate checklists prior to departure from Oklahoma City, Wichita, and Denver, on October 2, 1970.

104. The checklist gives the flight crew knowledge as to how the aircraft systems and engines are operating, and whether the aircraft is safe to make a takeoff.

105. Included in the checklist items actually performed on N464M was a power check, which determined all power-plant systems were performing normally.

106. During the flight of N464M on October 2, 1970, co-pilot Skipper routinely scanned the engine instruments, the configuration of which is such that he could and would have noticed any irregularity in the instrument readings had such occurred and lasted for any appreciable amount of time. At no time on October 2, 1970, from departure in Oklahoma City until his recollection ceased shortly before impact, did Skipper note any engine instrument indicating either engine was functioning outside its normal operational limits.

107. The aircraft N464M arrived at Stapleton International Airport, Denver, Colorado, at approximately 11:19 a. m. M.D.T., for planned refueling.

108. Twelve gallons of oil were placed in each engine supply tank of aircraft N464M at Denver, Colorado.

109. N464M was serviced with fuel at Denver, where the tanks were filled, bringing the total fuel load on board to 1,370 gallons.

110. The flight planning for N464M called for a northbound departure from Denver, on established airways, via Laramie, Wyoming. This route parallels the mountain ranges and offers ample time to climb to a safe altitude before turning westward over the mountains. The distance over this route is virtually the same as over the route ultimately flown by N464M.

111. At no time did the crew of N464M inform the FAA of their intention to depart from established airways during the flight from Denver, Colorado, to Logan, Utah.

112. The captain of N464M did not request a weather briefing from the United States Weather Bureau at the National Weather Service office in Denver, Colorado, prior to departure of N464M from Denver.

113. The maximum certified gross weight for takeoff of a Martin 404 aircraft at Denver, assuming airport elevation to be 5,330 feet above mean sea level (M.S.L.), and assuming the aircraft has been serviced with anti-detonation injection fluid, is approximately 42,975 pounds. If the aircraft has not been serviced with anti-detonation injection fluid, the maximum permissible takeoff weight at that altitude is 39,500 pounds.

114. Stapleton International Airport at Denver, Colorado, is located at an altitude of 5,330 feet M.S.L.

115. Aircraft N464M utilized anti-detonation injection fluid at the time of its takeoff at Stapleton Airport.

116. At takeoff from Denver, the take-off gross weight of N464M was approximately 48,165 pounds.

117. Prior to departure from Stapleton Airport on October 2, 1970, co-pilot Skipper purchased aeronautical and sectional charts for a contemplated scenic route.

118. Prior to departure from Stapleton Airport, co-pilot Skipper advised the pilot the aircraft would proceed over a scenic route of flight via Loveland Pass rather than flying the established airways from Denver to Logan, Utah.

119. N464M departed Stapleton International Airport at Denver, Colorado, at 12:29 p. m. M.D.T.

120. As N464M took off from the Denver airport, the tower reported to the pilots that quite a bit of smoke was coming from the right engine on takeoff. Such phenomena is a relatively common indication of a rich fuel mixture at high altitudes, however, and does not necessarily indicate any mechanical malfunction in the engines.

121. N464M was last observed by the FAA Air Traffic Control Specialist at Denver approximately four miles north of the departure end of Runway 35 and on a northerly heading.

122. It is a pilot's duty, whether flying under Part 91, 121, or 135 of Federal Aviation Regulations, to assure himself prior to takeoff that the aircraft is within its specified weight limits. The pilots of N464M flew into mountainous terrain with a plane overloaded by approximately 5,000 pounds.

123. N464M departed Denver's Stapleton Airport on October 2, 1970, and proceeded north until the aircraft intercepted the airway between Denver and Kremmling, Colorado, at which point the aircraft turned west and subsequently turned slightly south off of the established airway, proceeded past Nevadaville, and intercepted Clear Creek Valley in the vicinity of Idaho Springs, Colorado.

124. After intercepting Clear Creek Valley, N464M proceeded along and slightly south of U.S. Highway 6 past Georgetown and Silver Plume, Colorado, toward Loveland Pass.

125. The elevation of Georgetown, Colorado, which N464M flew over as it entered Clear Creek Valley, is 8,512 feet M.S.L. The elevation at Silver Plume, Colorado, is 9,118 feet M.S.L. From Silver Plume, the valley floor of Clear Creek Valley continues to rise, rising most sharply near Loveland Pass to reach an approximate elevation of 11,990 feet M.S.L. at the Pass.

126. In the area west of Georgetown, Colorado, the mountains on either side of Clear Creek Valley range from 12,447 feet M.S.L. to over 13,000 feet M.S.L.

127. Across the end of the valley at the Loveland Ski Resort area, the ground rises from the valley floor at 10,600 feet M.S.L. to 12,700 feet at the Continental Divide.

128. The minimum altitude necessary to clear Loveland Pass is approximately 12,000 feet M.S.L.

129. The distance from Dry Gulch to Loveland Pass is approximately two miles.

130. At the 10,800 foot contour, the valley width of Clear Creek Valley at ground level is approximately 2,400 feet.

131. The distance to the lowest point (12,517 feet M.S.L.) of the Continental Divide to the west of the course being taken by N464M when it arrived in the vicinity of Dry Gulch, was approximately three miles.

132. N464M was flown into Clear Creek Valley at an unreasonably low altitude. N464M flew into the Valley at an approximate altitude of 8,384–9,840 feet M.S.L., and it had climbed to only approximately 11,000 feet by the time it was near Dry Gulch. From its position over Dry Gulch, N464M was incapable of climbing in a straightforward course sufficiently to clear Loveland Pass.

133. At a point approximately over Dry Gulch, co-pilot Skipper, who had handled the aircraft controls since departure from Denver, decided to execute a teardrop turn in order to gain altitude. As he completed a sharp turn to the right, the aircraft began a deep vibration. The pilot, Crocker, looked

out the right side where the right wing was coming closer to trees on the mountainside, said, "I have it," took over the plane's controls, and made a sharp turn to the left. The left turn was so sharp that a passenger by the name of Stevens, who had walked up to stand behind the pilots in the cockpit, fell down. The plane then levelled and there was a surge of power to the engines just before the plane began hitting tops of trees on the side of the mountain.

134. N464M struck the tops of trees at an elevation of 10,800 feet M.S.L.

135. The time of the crash was approximately 1:00 p. m. M.D.T.

136. After the initial impact, N464M continued forward for approximately 500 feet before coming to a complete stop. Upon coming to a stop, the fusilage of the plane remained relatively intact, although most of the seats had pulled loose and were piled, along with passengers and luggage, against the front wall dividing the fusilage from the cockpit. Shortly after coming to a stop, the entire fusilage caught fire and burned.

137. Power conditions at impact of N464M were 2400 RPM, 165 BMEP (brake mean effective pressure) and 1400 BHP (brake horsepower). The engines on N464M were producing full climb power on impact and were functioning in an airworthy manner.

138. There is no evidence the crash of N464M was caused either wholly or in part by faulty landing gear, engine mounts, or fabric. Nor was there persuasive evidence that faulty seat belts or engines contributed to causation of the crash.

139. Weather conditions were not a factor in the crash. At the time of the crash and in the vicinity of the crash site, the weather was clear with unlimited ceiling and visibility. The wind was light and variable with no evidence of turbulence or up-and-down draft activity. At the time of the crash the flight was being conducted under visual flight rules.

140. The "Fasten Seat Belts" sign was not illuminated at the time N464M crashed, nor at any time immediately prior thereto. Some passengers had seat belts on and some did not. At least two passengers tried to fasten their seat belts but found them broken. At least one passenger sat in a seat with no seat belt, and one passenger was standing up near the cockpit at the time of the crash.

141. On October 8, 1970, the FAA issued an Emergency Order of Revocation, immediately revoking Golden Eagle's air taxi/commercial operator certificate. The Order was amended twice, once on October 20, 1970, and again on November 4, 1970.

142. The grounds for revocation included in the Second Amended Order of November 4, 1970, were: Golden Eagle engaged in carriage of the Wichita State University football team for hire in air commerce on September 11, 13, 25, 27, and October 2, 1970, without a commercial operator operating certificate or appropriate operations specifications issued under Part 121 of the Federal Aviation Regulations; Golden Eagle operated N470M on nine flights in interstate commerce in an unairworthy condition; Golden Eagle operated both N470M and N464M on October 2, 1970, when overweight; and Golden Eagle employed Leland T. Everett as a pilot or co-pilot in September and October, 1970, when he did not have a current and valid medical certificate, and therefore did not have an airman certificate authorizing him to serve in the capacity for which he was employed.

143. Golden Eagle appealed the FAA Emergency Orders of Revocation to a National Transportation Safety Board Hearings Examiner, who affirmed the FAA Orders on November 25, 1970.

144. Golden Eagle further appealed the initial decision of the Hearings Examiner to the full National Transportation Safety Board. On January 8, 1971, the Board affirmed the findings of the Hearing Examiner.

145. Prior to October 2, 1970, and specifically in late August and September, 1970, the FAA was diligently investigating and preparing a case against Golden Eagle for

suspected violation of Federal Aviation Regulations in connection with the flights for Western Electric.

## CONCLUSIONS OF LAW

1. The intent of Congress in enacting the Federal Aviation Act of 1958 was to improve air safety and to prevent or reduce tragic aviation accidents. The Federal Aviation Act of 1958 and Regulations adopted pursuant thereto create and establish an actionable duty on the part of FAA personnel to persons in the zone of danger, that is, air passengers, carrier pilots and personnel to carry out operational activities undertaken pursuant to the Act and Regulations in non-negligent manner. Part A of the Court's "Memorandum and Order on Dispositive Motions," filed January 31, 1977, addresses this issue more comprehensively and is included herein by reference.

2. The plaintiffs, or decedents for whom plaintiffs here sue, were all persons to whom a duty was owed to use due care by the United States and its FAA agents and/or employees.

3. An FAA inspector does not have discretion to ignore or approve a suspected violation of Federal Air Regulations. However, he has the discretion and authority to determine how extensively to investigate a suspected violation.

4. An FAA inspector has discretion and authority to recommend what sanction, if any, is appropriate for a known violation. Available sanctions include administrative, legal, criminal and certain others. The final decision as to legal sanctions to be imposed is made jointly by the Flight Standards Office and FAA legal counsel.

5. An FAA inspector has discretion to dispose of a known violation by informal administrative action when he deems such appropriate, and no legal action can thereafter be taken by the FAA for such violation.

6. Emergency Revocation of an aircraft airworthiness certificate may only forbid the specific aircraft from being flown upon proof it is unairworthy. Such procedure does not prevent an operator from utilizing another aircraft.

7. Emergency Revocation of an air taxi/commercial operator certificate requires Regional Counsel of the FAA to be prepared to prove FAA allegations before a National Transportation Safety Board hearing examiner immediately upon certificate-holder's appeal, or else risk dismissal of the enforcement action.

8. Under any non-emergency legal enforcement action against an operating certificate undertaken by Regional Counsel, the accused is entitled to notice, an adjudicatory hearing before a National Transportation Safety Board hearing examiner, and appeal to the full Board.

9. The discretionary function exception to the Federal Tort Claims Act found at 28 U.S.C. § 2680(a), is a jurisdictional bar to consideration of a legal claim if it applies. *Smith v. United States*, 546 F.2d 872 (10th Cir. 1976); *First National Bank in Albuquerque v. United States*, 552 F.2d 370 (10th Cir. 1977).

10. The actions of FAA personnel herein alleged to be negligently performed, were discretionary for purposes of the Federal Tort Claims Act exception mandating governmental immunity for discretionary acts even if such discretion be abused.

11. Even were the investigative and enforcement duties of FAA Flight Service personnel not discretionary under the Federal Tort Claims Act exception, the negligence of Abram found herein was not a proximate cause of the air crash and the consequent injuries and deaths of which plaintiffs complain.

12. An Authorized Inspector (AI), while performing inspection duties, is an employee of the FAA, as defined in and for purposes of the Federal Tort Claims Act.

13. The negligent inspection and certification of an aircraft by an AI is not barred from the Court's consideration as to liability of the Government by the misrep-

resentation exception to the Federal Tort Claims Act.

14. Martin 404 aircraft N464M was technically unairworthy on October 2, 1970, prior to its crash near Silver Plume, Colorado. However, such technically unairworthy condition was not a proximate cause of the crash. Therefore, negligence of the AI in inspecting and certifying N464M as airworthy was not a proximate cause of the injuries and deaths of which plaintiffs complain.

15. The third party complaint of the United States filed herein against the State of Kansas and Wichita State University alleging negligence of the State of Kansas through its public corporation, Wichita State University, was the proximate cause of the air crash and seeking indemnification from the State of Kansas as a joint tortfeasor in case federal governmental liability is adjudicated as a joint tortfeasor, is not barred under the Eleventh Amendment to the Constitution of the United States, as is more completely set forth in the Court's Memorandum and Order previously filed herein on May 26, 1973.

16. However, such liability of the State of Kansas, being solely contingent upon a judgment of liability in this cause against the United States, the State of Kansas has no liability herein. Since the United States has no liability as a tortfeasor, the Court finds it unnecessary to adjudicate any possible claimed tort liability against the State of Kansas.

17. Judgment is entered for the United States and against the plaintiffs herein in each of these multi-district cases.

18. Judgment is ordered for the third party defendant, State of Kansas, and against third party plaintiff, United States, on the third party complaint filed herein.

## OPINION OF THE COURT

### INVESTIGATIVE AND ENFORCEMENT DUTIES OF FAA PERSONNEL AS ALLEGED IN COUNT I ARE DISCRETIONARY

Plaintiffs' Count I alleges certain FAA officials negligently performed or failed to perform nondiscretionary duties involving enforcement of FAA regulations. Plaintiffs claim FAA officials Hanson, Abram, Plummer, and certain others knew or should have known from facts at their disposal of Golden Eagle's pattern of conduct violative of Part 121 of the Federal Aviation Regulations; failed to adequately investigate when Golden Eagle's connections with Wichita State University became apparent; failed to advise Wichita State University of the illegality and possible danger involved in the use of Golden Eagle's services; and failed to take timely enforcement action to halt the pattern of continuing violations by Golden Eagle. Plaintiffs contend these duties are mandatory, as set out in FAA Handbook 8030.7A, "Compliance and Enforcement," the FAA Handbook 2150.2, "Handbook for Handling Legal Aspects of Enforcement Cases," and particularly in a 1967 Order of the Federal Aviation Administrator outlining compliance and enforcement policy within the FAA. (See Appendix II for relevant sections of Handbooks and 1967 Order.)

The primary negligence alleged and for which proof was offered by plaintiffs, is that of Hanson and Abram in failing to adequately and expeditiously investigate and report Golden Eagle's violations and, upon receipt of Regional Counsel Plummer's legal opinion that Golden Eagle had entered into a contract specifying actions violative of the Federal Aviation Regulations, in failing to take appropriate action available to immediately stop Golden Eagle's operations. Although plaintiffs claim Hanson or Abram should have specifically warned Wichita State University of possible illegality of the Golden Eagle operations, there is nothing stated in the regulations, handbooks or orders outlining the duties of an inspector requiring him to directly warn persons involved with a possible violator prior to completion of investigation or initiation of enforcement against the violator. Therefore, the "warning" claim is merely another facet of plaintiffs' claim of improper investigation and inappropriate choice of

legal enforcement action by Hanson and Abram.

Defendant first alleges this Court has no jurisdiction to consider whether the investigative and enforcement actions or failures to act alleged herein were negligent because such duties are discretionary and exempted from the Federal Tort Claims Act waiver of sovereign immunity. 28 U.S.C. § 2680(a) excepts from Tort Claims Act provisions:

"Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

■ Courts have struggled to define discretionary functions or duties as applied to administrative officials since the adoption of the Federal Tort Claims Act. The general rule is:

"A duty is discretionary if it involves judgment, planning or policy decisions. It is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required." Jackson v. Kelly, 557 F.2d 735 (10th Cir. 1977), citing Nelms v. Laird, 4 Cir., 442 F.2d 1163, rev'd on other grounds, 406 U.S. 797, 92 S.Ct. 1899, 32 L. Ed.2d 499; Hendry v. United States, 418 F.2d 774 (2nd Cir. 1969).

To differentiate governmental discretion from professional expert evaluation, the Court must consider whether the decision involves policy judgment as to the public interest, balancing factors such as cost, purpose, and feasibility, or merely involves use of professional training to evaluate the most effective method for achieving results demanded in a specific situation. See Griffin v. United States, 500 F.2d 1059, 1064 (3rd Cir. 1974).

■ Because duties of high-ranking officials usually entail obvious policy-making functions, the question of whether duties are discretionary for lower level agency personnel is more complex. A determina-

tive factor is whether agency policy, as expressed in rules and regulations adopted by higher-ranking officials, is for lower-level personnel to make policy decisions on a case-by-case basis, guided only by general statements of agency philosophy, or whether such lower officials are required by rules and regulations to undertake limited specific functions upon being presented with a situation requiring some official action on their part. "The violation of a non-discretionary command takes what otherwise might be characterized as a 'discretionary function' outside the scope of the statutory exception" to the Tort Claims Act. Griffin v. United States, supra, at 1068–1069.

It is clear from the FAA "Compliance and Enforcement Handbook" that it was the mandatory duty of Hanson and Abram to investigate, report and close out by initiating appropriate administrative, legal, or criminal enforcement action as to any alleged or actual violation of Federal Aviation Regulations observed or brought to their attention. The four types of enforcement action available to the inspector are set out with some general guidelines of factors he should take into consideration. From the FAA "Handbook for Handling Legal Aspects of FAA Enforcement Program," it is clear that Flight Standards Service Offices have a duty to conduct prompt investigations, to independently analyze facts reported by the reporting inspector in cases being processed for legal enforcement action, to submit complete reports to counsel, and to reach agreement with counsel as to the applicable sanctions. In this instance, after Hanson, as inspector, determined from his investigation, and Plummer's legal opinion that legal enforcement action would be appropriate, he forwarded a report and all documents to the Air Carrier District Office of Flight Standards, who had the duty to further investigate and concur with Regional Counsel upon sanctions to be sought.

From the Aviation Administrator's 1967 Order Outlining Compliance and Enforcement Policy, it is clear the decision as to the extent of investigation, and which enforce-

ment procedure is "appropriate," is left to the lowest operational level of Flight Standards "appropriate to the violation involved." Thus, it is the inspector's duty to determine what investigation is "appropriate," and upon completion of such, to determine whether to take administrative or special emergency action, or to forward the report for legal enforcement. It is the duty of the next level of flight Standards to again determine if further investigation is needed to build a legal enforcement case, and to determine, together with counsel, what sanctions should be applied. The guidelines given by the Order are:

"Agency actions, from investigation to disposition, must insure fair and equal treatment for everyone. This requires each FAA employee to approach his work objectively and to pursue each step of the process without delay. Also, consideration must be given to the fact that those who carry persons or property by aircraft for compensation or hire have a duty to perform their services with the highest possible degree of safety."

Lower-level judgments as to the appropriate extent of investigation and enforcement are then subject to monitoring on regional and national levels to ascertain fair and equal treatment of the aviation community, to provide assurance action taken will serve to promote safety and protect the public interest, and to insure consistent enforcement nationally.

A recent Tenth Circuit case considered whether duties of certain Department of Agriculture personnel in devising warning labels for pesticides, and in investigating the dangers connected with prior use of such pesticides, were discretionary within the Tort Claims Act exception. See *First National Bank v. United States*, 552 F.2d 370 (10th Cir. 1977). In that case the Court found requirements directing agency personnel as to "warnings, precautionary language and 'directions for use' were phrased in terms of general policy standards to be applied by the agency." The standards stated required warnings "necessary and, if complied with, adequate to prevent injury." The court stated, at pages 375–376:

"Thus, the statute and the regulations staked out only generalized policy standards for the precautions, warnings and directions for use. To enforce these standards, and give content and meaning to them, the agency was required to make policy judgments in evaluating the adequacy of the labeling."

In the *First National Bank* case, the Court also considered plaintiff's claim that agency personnel had failed to marshal and submit available facts to the Secretary for a decision on cancellation of the product's registration, and no policy judgment was exercised in the pro-forma decision allowing re-registration. The Court stated, at page 377:

"We note first that the decision-making as to possible suspension or cancellation does implicate a policy choice based on substantive standards of product safety in terms of protection of the public and impact on living man. [Citations deleted.] Whether such discretion is exercised and possibly abused, or whether there is a failure to exercise the discretion, such acts or omissions related to the cancellation function are within the terms of the exception provided by § 2680(a).

"We feel the claims and proof relating to alleged failure to marshal and submit data to the Secretary or to his surrogate, the Director of PRD, fall in the same category. These actions are an integral part of the process for any possible cancellation or suspension of a registration. If we accepted plaintiff's argument that such acts of negligence or such omissions of staff personnel are unprotected, then . . . 'the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.'"

As in *First National Bank*, the standard by which Flight Standards personnel are to make decisions upon the extent of investigation is "phrased in terms of general poli-

cy standards to be applied by the agency," rather than in terms of certain actions which must be undertaken once an inspector is presented with a specific situation. The standard as set out in the Administrator's 1967 Order is *appropriateness.* Even the General Guidelines for determination as to sanctions found at Paragraph 17 of the "Compliance and Enforcement Handbook" are phrased as suggestions of "appropriate" considerations, adding, "The ultimate decision must be the product of judgment and experience applied to the facts and circumstances of the individual case." Clearly a decision as to sanctions involves considerations of public safety and air industry standards, and is by its very nature a policy judgment.

Thus, by the general policy standards imposed upon Flight Standards personnel, the Federal Aviation Administrator not only recognizes the discretionary nature of investigative and enforcement duties, but further demands, as a matter of agency policy, that such discretion be exercised at the lowest level appropriate to the violation involved. The primary consideration of the Administrator in monitoring such decisions is to insure the overall FAA policy, as developed through such individual decisions, is uniform and fair nationwide, and not to insure each fits within a defined and mandatory standard set out at the national level. The mandate of agency policy, in this instance, far from taking what otherwise might be a discretionary function out of the scope of the Tort claims Act exception, firmly demands discretion be exercised in every decision as to appropriate investigation and sanctions for Federal Aviation Regulations violations.

For the above reasons, the Court finds plaintiffs' claim as to negligent investigation and enforcement by FAA officials is barred by the discretionary function exception to the Federal Tort Claims Act.

## THE EVIDENTIARY PROXIMATE CAUSE ISSUE UNDER COUNT I

Having found plaintiff's first cause of action barred by § 2680(a) of the Federal Tort Claims Act, and such judgment being a jurisdictional bar in this circuit, the court need not determine whether the evidence offered in support of such claim would merit a finding of FAA negligence proximately causing plaintiffs' damages. Nevertheless, in the interest of judicial economy and the most complete judicial determination of multi-district litigation, since the court has heard and considered the evidence, both testimonial and depositional, and the stipulations and admissions of the parties, he will proceed to a decision on the kindred issue of proximate cause by any act of negligence of an employee of the United States. Under the facts as set out in the Court's Findings of Fact, the investigation into the Western Electric—Golden Eagle contract and enforcement proceedings relevant thereto were being non-negligently carried out by FAA personnel at the time of the air crash. The only FAA negligence found by the Court was in Abram's failure to properly investigate the lease and service contract under which Golden Eagle flew the Wichita State basketball team on December 3, 1969, in Abram's subsequent failure to investigate Golden Eagle's connections with Wichita State in light of the August Flyer he received, and to make the reasonable inference of the connective nature of the events.

The Court finds it would be mere speculation, however, to find Abram's acts of omission proximately caused the October 2, 1970 crash giving rise to plaintiffs' damages. Even had Abram investigated and understood the nature of the December 1, 1969 arrangement between Golden Eagle and Wichita State, he could have simply issued an administrative warning or sanction to or upon the parties or initiated legal proceedings which could have resulted in a fine or loss of Golden Eagle's certification. Conceivably, such enforcement action could have been merged with the later investigation concerning the Western Electric contract, since Golden Eagle was a common party in each transaction. The Court is not prepared to find any of these possible courses would or would not have been properly taken. The Court will not speculate

upon whether investigation in support of legal proceedings and the possible proceedings themselves for revocation of Golden Eagle's certificate would have been completed prior to October 2, 1970 had the Golden Eagle—Wichita State contracts been provided FAA Regional Counsel prior to his receipt of the Golden Eagle—Aero Data Link—Western Electric contracts.

Even were the court willing to indulge in speculations outlined above, he cannot find the illegalities perhaps evidenced in the December 3, 1969 and subsequent Golden Eagle—Wichita State agreements and not discovered by the FAA because of negligent investigation, were such as to proximately cause the October 2, 1970, air crash. It is true, as plaintiffs claim, that Part 121 of the Federal Aviation Regulations provisions was enacted to insure more detailed safety compliance by a commercial operator. However, the elemental safety precautions the Court has found were ignored by Golden Eagle personnel piloting N464M on October 2, 1970, were also required under Part 91 of the Regulations for all General Aviation. It is speculative to assume pilots who would ignore such generally respected safety precautions required under Part 91, which provisions they were claiming regulated their flight, would follow such rules more closely under Part 121. There is some evidence before the court that, had Wichita State arranged for its own plane lease, fuel, and ground services, and Golden Eagle personnel limited their role to piloting the plane, this operation would have been a legal Part 91 flight. In his first deposition, Skipper testified had Golden Eagle been aware that the FAA considered it the "operator" of the Wichita State trips, the trip of October 2, 1970 might have continued under different documentation with the University responsible for purchasing fuel. In view of the guile shown by using the phoney Aero Data and Donald Pinger as its phoney officer, the court finds this admission to have the ring of truth. In sum, it is simply too speculative to assume the October 2, 1970 trip would not have been made, or would have been made with more pilot care, had Abram diligently investigated terms of the Golden Eagle—Wichita state agreements.

For the above reasons, the Court finds even were plaintiffs' first cause of action not barred by § 2680(a) of the Federal Tort Claims Act, there is no proof the negligence of any FAA official, investigating Golden Eagle activities or in prosecuting enforcement proceedings against Golden Eagle, was a proximate cause of the tragic air crash of October 2, 1970, near Silver Plume, Colorado.

NEGLIGENT INSPECTION AND CERTIFICATION BY FAA INSPECTORS BREACH AN ACTIONABLE DUTY UNDER TORT CLAIMS ACT AS ALLEGED IN COUNT II

Plaintiffs' Count II alleges an authorized inspector (AI), while acting in the course and scope of employment for the United States, carelessly and negligently inspected, examined, tested, licensed and certified as airworthy the aircraft, when in fact such aircraft was not airworthy but unfit and unsafe to fly. Plaintiffs state such unairworthy condition was the proximate cause of the air crash of October 2, 1970, which resulted in injuries and deaths of which plaintiffs herein complain. Plaintiffs offered evidence to prove Donald Sizemore, an AI certified by the FAA, did negligently inspect N464M approximately one month prior to the date of the air crash, and after failing to discover and report several deficiencies, he certified in the aircraft maintenance records that he found the craft to be in airworthy condition and approved it for return to service.

Defendant first contends Sizemore, as an AI, was not an employee of the United States. Although the Court found upon undisputed facts submitted upon defendants' motion for summary judgment that an AI is an employee of the United States within the meaning of the Federal Tort Claims Act, the court allowed further presentation of evidence upon the question at trial. Upon the basis of facts as set out in the Findings of Fact, the Court here af-

firms and readopts the portion of its Memorandum and Order of January 31, 1977 in this action, finding Sizemore was acting as an employee of the United States at the time of his inspection of N464M and certification of its airworthy condition.

Defendant next contends that even if Sizemore were an employee of the United States at the time of his inspection and certification of N464M, plaintiffs' cause of action is barred by the misrepresentation exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(h).

Most of the legal contentions advanced by either side have previously been addressed by this Court in a memorandum opinion. However, the viability of the misrepresentation contention appears not to have been analyzed by the Court.

This Court holds the misrepresentation exception of § 2680(h) is not applicable under the facts here. In this decision the Court principally relies on two United States Supreme Court opinions, one decision of the Court of Appeals, and one District Court decision of great clarity, viz.: *Indian Towing Company v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961); *Ingham v. Eastern Airlines*, 373 F.2d 227 (2d Cir. 1967); and *Marival, Inc. v. Planes, Inc.*, D.C., 306 F.Supp. 855 (1969).

In *Indian Towing*, liability of the government was upheld under the Tort Claims Act for property damages occasioned when a vessel ran aground as a result of the Coast Guard's allegedly negligent failure to maintain the beacon light in a lighthouse. Specifically, the alleged negligence was the failure of the Coast Guard personnel to check the electrical system which operated the light, the failure to make a proper examination of the connections and other apparatus connected with the light, and the failure to repair the light or give notice to vessels that the light was not functioning. Although the misrepresentation exception was apparently not urged as a defense, nor much more than alluded to by the Court in its decision, other than noted as "substantive limitation," it was not there considered a bar to recovery.

As will be noted following, the *Indian Towing* case was considered precedential in *Neustadt* and other later federal cases, and more significantly, the factual situation and allegations of governmental negligence closely resemble acts or omissions of Sizemore, the FAA authorized inspector in this case.

The Supreme Court has definitively analyzed the misrepresentation exception to the Tort Claims Act in *Neustadt*. Appellees therein sued the United States for damages resulting from their purchase of a home for a price in excess of its true market value because of reliance upon a negligently excessive FHA appraisal. The FHA was required by Congress in the National Housing Act to inspect and appraise property for which the FHA planned to issue mortgage insurance to private banking or other lending institutions to facilitate easy financing to home buyers by insuring or guaranteeing the lending institution against loss. The insurance would be issued up to a certain percentage of the appraised value. A seller of property approved for FHA mortgage insurance was required by the same Act to deliver, prior to sale, a written statement of the FHA appraisal value to the purchaser. It was this statement appellees relied upon in paying an excessive price for their home.

The Supreme Court found Congress, in the National Housing Act, had:

"... repeatedly emphasized that the primary and predominant objective of the appraisal system was the 'protection of the government and its insurance funds'; ... and that 'there is no legal relationship between the FHA and the individual mortgagor.' Never once was it even intimated by an FHA appraisal that the government would, in any sense, represent or guarantee to the purchaser that he was receiving a certain value for his money." *United States v. Neustadt*, supra.

The fact that an accurate appraisal would have benefit to the home buyer mortgagor and be relied on by him was incidental to the primary purpose of the statute. The Supreme Court, in *Neustadt*, further held that Congress knew and intended to include negligent misrepresentation which traditionally in the law of torts encompassed a duty to use due care in obtaining and communicating information upon which another party may reasonably be expected to rely in the conduct of his economic affairs. The Court went on to differentiate such incidental misrepresentation occurring in financial or commercial transactions where the government was a party from those cases the government fails in an assumed duty to warn of a particular hazard. The *Neustadt* opinion carefully limited its holding without derogating the previous opinion in *Indian Towing* as illustrated at footnote 26:

> "Our conclusion neither conflicts with nor impairs the authority of *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, which held cognizable a Torts Act claim for property damages suffered when a vessel ran aground as a result of the Coast Guard's allegedly negligent failure to maintain the beacon lamp in a lighthouse. Such a claim does not 'arise out of . . . misrepresentation,' any more than does one based upon a motor vehicle operator's negligence in giving a misleading turn signal. As Dean Prosser has observed, many familiar forms of negligent conduct may be said to involve an element of 'misrepresentation,' in the generic sense of that word, but 'so far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit,' and has been confined 'very largely to the invasion of interests of a financial or commercial character, in the course of business dealings.' Prosser, Torts, § 85, 'Remedies for Misrepresentation,' at 702–703 (1941 ed.). See also, 2 Harper and James, Torts, § 29.13 at 1655 (1956)."

In *Ingham*, the distinction between the type of torts to which the misrepresentation exception applies, and the type to which it does not apply, was again enunciated by Judge Irving Kaufmann, of the Second Circuit panel. That case involved the causation and liability for the crash of an Eastern Airlines plane at Kennedy International Airport in New York City, in which it was held Eastern's flight crew and government FAA flight control personnel were jointly culpable. The FAA negligence alleged, proved and found to be a proximate cause of the crash was failure of an employee, in accordance with FAA regulations, to advise of a change and worsening of a foggy weather condition which affected the plane crew's landing visibility. The "misrepresentation exception" of the Tort Claims Act was specifically argued as a legal defense to governmental liability.

Judge Kaufmann clearly analyzes and differentiates those cases like *Neustadt* where the misrepresentation exception is held a bar to recovery from the *Indian Towing* and his *Ingham* case where the misrepresentation exception does not apply.

Finally, in *Marival, Inc. v. Planes, Inc.*, supra, the District Court case, Judge Edenfield, in an erudite and most expositive opinion, clearly analyzes the frequent judicial and lawyer misconception of the nature and scope of the misrepresentation exception in the Tort Claims Act. Judge Edenfield lays it out at pp. 857–860, as follows:

> "Misrepresentation, as used in § 2680(h) as an exemption from tort liability, may consist of either deliberate and wilful misrepresentation or negligent misrepresentation. [Citing Prof. Prosser's textbook on Tort Law and *Neustadt*.]

> . . . . .

> "The line between negligent conduct and negligent misrepresentation is often difficult to draw with precision. An element of misrepresentation runs through many forms of negligent conduct. Indeed, negligent misrepresentation involves underlying negligent action. But more is needed to come within the misrepresentation exemption of § 2680(h) than merely an element of misrepresentation. [Citing *Neustadt*.]

"Cases in which the courts have found negligence, rather than negligent misrepresentation, involve factual situations in which the misrepresentation involved is incidental to the negligent conduct. Thus, for example, *Ingham v. United States*, 373 F.2d 227 (2d Cir. 1967), cert. denied, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292, and *United Air Lines Inc. v. Wiener*, 335 F.2d 379 (9th Cir. 1963), cert. dismissed 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549, involved personal injury actions directly arising from the negligent failure to perform a duty. In *Ingham*, the Federal Aviation Agency controller failed to notify the crew of a plane of an adverse weather change. In *Wiener*, the Air Force failed to study commercial passenger air traffic in the area of an Air Force base as required by Air Force regulations and therefore breached their duty to warn pilots of the dangers of collision. *In each instance, negligent performance of operational tasks led directly to personal injury.* [Emphasis added.] Of course, as the court stated in *Wenninger v. United States*, 234 F.Supp. 499, 505 (D.Del.1964):

'A failure to warn of an existing danger, when a duty to do so exists, is in a sense an implicit assertion that there is no danger. For some purposes, at least, this may be properly characterized as a misrepresentation. This is not the type of misrepresentation, however, that § 2680(h) was intended to cover.' "

In *Marival*, an action was brought by an airplane buyer to recover from sellers. Sellers brought third-party action against the United States on the theory that sellers made alleged misrepresentations as to condition of an airplane in reliance upon certification of airworthiness given by an inspector of the Federal Aviation Agency. Upon the Government's dispositive motion to dismiss or for summary judgment, Judge Edenfield held that the third-party action against the government was barred by § 2680(h) exempting government from liability under the Federal Tort Claims Act for any claim arising out of misrepresentation. In support of his holding, Judge Edenfield said:

"An analysis will show defendants' complaint and hopes for recovery are bottomed upon negligent misrepresentation, rather than negligent conduct.

. . . . .

"Thus, the defendants' third-party complaint does not seek the recovery of damages for any direct injuries flowing from the negligent inspection. . . . Rather, it seeks to use the inspector's certification to explain its alleged statements to the plaintiff, and indemnify itself against any recovery in the main action. The instant case presents a classic example of detrimental reliance upon an allegedly negligent misrepresentation in a commercial transaction. It was precisely this type of action, involving direct reliance on governmental communication of facts, rather than direct injury from negligent conduct, which § 2680(h) was designed to meet."

At the risk of oversimplifying what my learned colleagues have carefully and correctly, I believe, analyzed at length, this Court will attempt to synthesize the criteria necessary for successful recovery under the Tort Claims Act.

■ First, there must be created an actionable duty to plaintiff or his class by statute or regulation whose primary purpose was to protect them from danger flowing directly out of such duties.

Second, the proximate cause of injury must be based on negligent conduct of the government employee at an operational level.

■ Conversely stated, the misrepresentation exception will be applicable if either of two events occur: (1) any governmental duty under a statute or regulation is incidental or secondary to the primary statutory purpose; or (2) the injury stems proximately from a misrepresentation of facts based on either negligent or non-negligent conduct, rather than upon the conduct itself.

It is clear to this Court that the legal and factual allegations herein are closely aligned to those of *Indian Towing* and *Ingham*, rather than those of *Neustadt* and *Marival*. The Court has previously found the purpose of the Federal Aviation Act of 1958 to be protection of the class of persons of which plaintiffs are members from the type of tragedy herein alleged. The inspection of the aircraft, and the written record of such inspection, as stated in the certification, is to insure detection and enforce remedying of defects in the aircraft inimical with its "condition for safe operation" (49 U.S.C. § 1423(c)), not to calculate or insure the value of the inspected plane. The defendant's duty to promote safety through inspection and certification of planes is not incidental to the purpose of this Act but is the very reason for its enactment. Plaintiffs are not the incidental beneficiaries but the intended beneficiaries of the duties of inspection and warning preempted by the FAA.

If plaintiffs were here complaining that the value of an airplane purchased by them is less than they reasonably expected after reliance upon defendant's negligent certification of airworthiness, such claim would clearly be barred by the misrepresentation exception to the Tort Claims Act, in that it concerns injury to commercial interests resulting from reasonable reliance upon representations made by the government but not intended for the benefit of plaintiffs' commercial interests. See *Marival, Inc. v. Planes, Inc.*, supra. Many cases cited by defendant as applying the negligent misrepresentation exemption do fit within the definition outlined in *Neustadt* and concern misrepresentations relied upon in the conduct of plaintiffs' economic affairs. See *Hall v. United States*, 274 F.2d 69 (10th Cir. 1959); *Western Steel Buildings, Inc. v. Adams*, 286 F.Supp. 570 (D.Colo.1968). In going beyond this definition, however, and alleging the present situation is exempted by misrepresentation exception as outlined in *Neustadt*, however, "the government's reading of the misrepresentation exception is much too broad, for it would exempt from tort liability any operational malfunc-

tion by the government that involved communications in any form." *Ingham v. Eastern Airlines, Inc.*, supra. This Court specifically rejects the reasoning of cases which would so extend the misrepresentation exception.

The present case alleges a negligent failure on the part of a government employee to perform an operational duty undertaken to protect the safety of air travelers. The United States, through the FAA, has preempted and assumed the duty of inspecting aircraft in order to detect and require repair of potentially dangerous conditions before such aircraft can thereafter be utilized. If a negligently performed inspection does not reveal a defect which reasonably should have been detected, and if, in reliance thereof, such defect is thereafter allowed to remain in such aircraft and if such defect ultimately causes the crash of the aircraft and injury to passengers, then the negligence of the inspector in allowing such defect to go unremedied is a proximate cause of passengers' injuries. It is the inspection undertaken to protect air travelers from certain dangers which is relied upon by such travelers and which, if negligently performed, gives rise to the very dangers the inspection was intended to prevent. The certification is a reporting of results of such inspection but was not in itself relied upon by plaintiffs in any economic affairs. As stated in *Ingham*, at p. 239:

> "Where the gravamen of the complaint is the negligent performance of operational tasks, rather than misrepresentation, the government may not rely upon § 2680(h) to absolve itself of liability."

In this case, the allegations of plaintiffs in Count II state a good cause of action under the Tort Claims Act.

## THE EVIDENTIARY PROXIMATE CAUSE ISSUE UNDER COUNT II

In his Findings of Fact the Court found Sizemore was negligent in his inspection of N464M in four respects: (1) he failed to perform a landing gear retraction test; (2) failed to examine X-rays of the engine

mount prior to signing off the log book; (3) failed to perform a fabric check on the rudder; and (4) failed to report the absent and useless seat belts on the aircraft. The Court also found there is no persuasive evidence the crash of N464M was caused either wholly or in part by faulty landing gear, engine mounts, or fabric. Obviously, the crash was not caused by defective seat belts.

Plaintiffs allege, however, that the injuries and deaths complained of were caused by missing or defective seat belts, and offered evidence to the effect that had such seat belts been operational and fastened, many more persons would have survived the crash. The Court rules, however, that on the basis of the unsubstantiality and credibility of the evidence presented, he cannot find the absence of proper seat belts proximately caused the injuries and deaths. The crash did not occur during a planned takeoff or landing, and the "Fasten Seat Belts" sign was not lighted at the time N464M crashed, nor immediately prior thereto. Plaintiffs' evidence as to proximate cause assumed less injuries and deaths would have occurred if *all* seat belts had been securely fastened. Even if all seat belts had been functioning properly, there is no basis upon which the Court can find all, or even most of them, would have been fastened at the time of the crash; or further, that a particular passenger might have survived or had his injury lessened even if belted in his seat.

Therefore, although the Court finds Sizemore was an employee of the United States at the time of his inspection and certification of N464M as airworthy, and the Court further finds such inspection was negligently performed, the Court finds such negligence was not a proximate cause of the October 2, 1970 air crash in which plaintiffs or plaintiffs' decedents were injured or killed.

It may seem harsh to some—and particularly these plaintiffs—that another door is closed to recovery of damages for the tragic deaths and injuries to a large number of innocent people which obviously were caused by faulty or negligent conduct of some of the actors involved. To this point in this long series of law suits, as the Court is informed, recovery has been denied by financial irresponsibility of some of the personal and corporate actors, by the invocation of state sovereign immunity for tort liability in Kansas state litigation, by Court judgment against liability of the plane manufacturer in Oklahoma federal court litigation, and now by judgment of federal immunity and no fault upon the part of the United States in this court.

While some of these consolidated causes of action still pend here as to some of the personal and corporate parties, it is doubtful, as conceded by plaintiffs' counsel, if further trial proceedings will be necessary, in view of the asserted financial irresponsibility of those parties.

The Court has noted that litigation presently exists in the Kansas state courts on the last existing avenue of recovery, i. e., the contractual liability aspect involving the contract between Wichita State University and Golden Eagle, in which the University agreed to carry passenger liability insurance. It is to be hoped that resolution of this legal remedy may in part be able to recompense these plaintiffs.

The Clerk of this Court is hereby directed to enter judgment in conformity with this Opinion as to the various plaintiffs and the United States as a defendant, and as to the United States and Wichita State University, a public corporation, and the State of Kansas, relative to the third-party complaint of the United States.

IT IS SO ORDERED at Wichita, Kansas, this 6th day of October, 1977.

Appendices to follow.

APPENDIX I

CIVIL NO. W–4749
MARVIN G. BROWN, SR.

PLAINTIFF

vs.

JACK RICHARDS AIRCRAFT COMPANY, INC.; JACK RICH-
ARDS, individually; GOLDEN EAGLE AVIATION, INC.; RON-
ALD G. SKIPPER; BRUCE J. DANIELSON; JOHN P. KEN-
NEDY; UNITED STATES OF AMERICA; WICHITA STATE
UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4750
HOWARD L. JOHNSON

PLAINTIFF

vs.

JACK RICHARDS AIRCRAFT COMPANY, INC.; JACK RICH-
ARDS, individually; GOLDEN EAGLE AVIATION, INC.; RON-
ALD G. SKIPPER; BRUCE J. DANIELSON; JOHN P. KEN-
NEDY; UNITED STATES OF AMERICA; WICHITA STATE
UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4751
ROBERT B. KRUEGER

PLAINTIFF

vs.

JACK RICHARDS AIRCRAFT COMPANY, INC.; JACK RICH-
ARDS, individually; GOLDEN EAGLE AVIATION, INC.; RON-
ALD G. SKIPPER; BRUCE J. DANIELSON; JOHN P. KEN-
NEDY; UNITED STATES OF AMERICA; WICHITA STATE
UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4752
MILTON B. MOORE, SR.

PLAINTIFF

vs.

JACK RICHARDS AIRCRAFT COMPANY, INC.; JACK RICH-
ARDS, individually; GOLDEN EAGLE AVIATION, INC.; RON-
ALD G. SKIPPER; BRUCE J. DANIELSON; JOHN P. KEN-
NEDY; UNITED STATES OF AMERICA; WICHITA STATE
UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4753
THOMAS B. OWEN, SR.

PLAINTIFF

vs.

JACK RICHARDS AIRCRAFT COMPANY, INC.; JACK RICH-
ARDS, individually; GOLDEN EAGLE AVIATION, INC.; RON-
ALD G. SKIPPER; BRUCE J. DANIELSON; JOHN P. KEN-
NEDY; UNITED STATES OF AMERICA; WICHITA STATE
UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4754
MARY P. STINES

PLAINTIFF

vs.

JACK RICHARDS AIRCRAFT COMPANY, INC.; JACK RICH-
ARDS, individually; GOLDEN EAGLE AVIATION, INC.; RON-
ALD G. SKIPPER; BRUCE J. DANIELSON; JOHN P. KEN-
NEDY; UNITED STATES OF AMERICA; WICHITA STATE
UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4755
JACK R. VETTER, SR.

PLAINTIFF

vs.

JACK RICHARDS AIRCRAFT COMPANY, INC.; JACK RICH-
ARDS, individually; GOLDEN EAGLE AVIATION, INC.; RON-
ALD G. SKIPPER; BRUCE J. DANIELSON; JOHN P. KEN-
NEDY; UNITED STATES OF AMERICA; WICHITA STATE
UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4924
VERN KIESAU

PLAINTIFF

vs.

UNITED STATES OF AMERICA; WICHITA STATE UNIVER-
SITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4936
HALLIE EUGENIA ROBINSON, Individually, and as Adminis-
tratrix of the Estate of EUGENE ROBINSON and DERRICK
LAMAR ROBINSON and DAVID L. ROBINSON, Minors, by and
through, Hallie Eugenia Robinson, their natural parent, next
friend and duly appointed guardian

PLAINTIFFS

vs.

JACK RICHARDS AIRCRAFT COMPANY, INC., a corporation,
GOLDEN EAGLE AVIATION, INC., a corporation, and JACK
RICHARDS, RONALD G. SKIPPER, BRUCE J. DANIELSON,
JOHN P. KENNEDY, Individuals; WICHITA STATE UNIVER-
SITY, a public corporation, and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4941
RICK STEVENS; BOB RENNER; GLENN KOSTAL; DAVIS
LEWIS; RANDY JACKSON; MIKE BRUCE; JOHN HO-
HEISEL; KEITH MORRISON; THOMAS D. CHRISTIAN and
RUTH CHRISTIAN; EDDIE COLEMAN; WILLA HALL,
RUTH RICHARDSON; SCOTT THOMAS REEVES and BRAD-
LEY ARNOLD REEVES, minors by their guardian ad litem
DIANNE L. REEVES, and DIANNE L. REEVES; ROYCE
TAYLOR; D. W. FAHRBACH; RUTH E. FAHRBACH; ERIC
GROOMS and NANCY LEE GROOMS, minors by their guardian

ad litem TOMMY GROOMS; DOROTHY HARRISON; VALORY KIMMEL, a minor by his guardian ad litem DIANNE KIMMEL, and DIANNE KIMMEL; GARY RAY KING, TERRI ANN KING, LORI LOU KING, LISA KAY KING, JULI JAN KING and DINA SUE KING, minors, by their guardian ad litem CLIFFORD KING, JOHN WILSON and ELIZABETH WILSON, minors by their guardian ad litem ARVEL SMITH; VICKIE F. DUNN, LISA A. DUNN and GARY LEE DUNN, minors by their guardian ad litem L. L. ROBERTS; HOWARD JOHNSON; and DEREK WILLIAM LANE and NICK ALVIN LANE, minors by their guardian ad litem JAMES W. LANE, and JAMES W. LANE; MARY LYNNE KNOTT

PLAINTIFFS

vs.

THE UNITED STATES OF AMERICA; WICHITA STATE UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4993
HALLIE EUGENIA ROBINSON, Individually, as Administratrix of the Estate of EUGENE ROBINSON, Deceased, and as Guardian of the Person and Estate of DERRICK LAMAR ROBINSON and DAVID L. ROBINSON, Minors

PLAINTIFFS

vs.

UNITED STATES OF AMERICA

DEFENDANT

CIVIL NO. W–4994
LEO LOY ROBERTS, Administrator of the Estate of Judith Ann Dunn, Deceased, and JAMES W. LANE

PLAINTIFFS

vs.

THE UNITED STATES OF AMERICA; WICHITA STATE UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–4995
RICK STEVENS; BOB RENNER; GLENN KOSTAL; DAVID LEWIS; RANDY JACKSON; MIKE BRUCE; JOHN HOHEISEL; THOMAS D. CHRISTIAN and RUTH CHRISTIAN, Co-Administrators of the Estate of DON CHRISTIAN, Deceased; EDDIE COLEMAN, Executor of the Estate of RAY COLEMAN, deceased, WILLA HALL and RUTH RICHARDSON; SCOTT THOMAS REEVES and BRADLEY ARNOLD REEVES, minors, by their guardian ad litem DIANNE L. REEVES, and DIANNE L. REEVES; KEITH MORRISON; and ROYCE R. TAYLOR, Administrator of the Estate of JOHNNY TAYLOR, Deceased

PLAINTIFFS

vs.

THE UNITED STATES OF AMERICA; WICHITA STATE UNIVERSITY, a public corporation and STATE OF KANSAS

DEFENDANTS

CIVIL NO. W–5007
VERN KIESAU, Individually and as Next Friend of THOMAS KIESAU, a Minor, and ZERITA KIESAU

PLAINTIFFS

vs.

ROBERT V. REYNOLDS, GEORGE W. IRELAND, FRANK E. HAND, JR.

DEFENDANTS

CIVIL NO. W–5008
RICK STEVENS; BOB RENNER; GLENN KOSTAL; DAVID LEWIS; RANDY JACKSON; MIKE BRUCE; JOHN HO-HEISEL; KEITH MORRISON; THOMAS D. CHRISTIAN and RUTH CHRISTIAN; EDDIE COLEMAN, WILLA HALL, RUTH RICHARDSON; SCOTT THOMAS REEVES and BRAD-LEY ARNOLD REEVES, minors by their guardian ad litem DIANNE L. REEVES, and DIANNE L. REEVES; ROYCE TAYLOR; D. W. FAHRBACH; RUTH E. FAHRBACH; ERIC GROOMS and NANCY LEE GROOMS, minors by their guardian ad litem TOMMY GROOMS; DOROTHY HARRISON; VAL-ORY KIMMEL, a minor by his guardian ad litem DIANNE KIMMEL, and DIANNE KIMMEL, and DIANNE KIMMEL; GARY RAY KING, TERRI ANN KING, LORI LOU KING, LISA KAY KING, JULI JAN KING and DINA SUE KING, minors by their guardian ad litem CLIFFORD KING; JOHN WILSON and ELIZABETH WILSON, minors by their guardian ad-litem ARVEL SMITH; VICKIE F. DUNN, LISA A. DUNN and GARY LEE DUNN, Minors by their guardian ad litem L. L. ROBERTS; HOWARD JOHNSON; and DEREK WILLIAM LANE and NICK ALVIN LANE, Minors by their guardian ad litem JAMES W. LANE, and JAMES W. LANE

PLAINTIFFS

vs.

THE UNITED STATES OF AMERICA

DEFENDANT

CIVIL NO. W–5009
RICK STEVENS; BOB RENNER; GLENN KOSTAL; DAVID LEWIS; RANDY JACKSON; MIKE BRUCE; JOHN HO-HEISEL; KEITH MORRISON; THOMAS D. CHRISTIAN and RUTH CHRISTIAN; EDDIE COLEMAN, WILLA HALL, RUTH RICHARDSON; SCOTT THOMAS REEVES and BRAD-LEY ARNOLD REEVES, minors by their guardian ad litem DIANNE L. REEVES, and DIANNE L. REEVES; ROYCE TAYLOR; D. W. FAHRBACH; RUTH E. FAHRBACH; ERIC GROOMS and NANCY LEE GROOMS, minors by their guardian ad litem TOMMY GROOMS; DOROTHY HARRISON; VAL-ORY KIMMEL, a minor by his guardian ad litem DIANNE KIMMEL, and DIANNE KIMMEL; GARY RAY KING, TERRI ANN KING, LORI LOU KING, LISA KAY KING, JULI JAN KING and DINA SUE KING, minors by their guardian ad litem CLIFFORD KING; JOHN WILSON and ELIZABETH WILSON, minors by their guardian ad litem ARVEL SMITH; VICKIE F. DUNN, LISA A. DUNN and GARY LEE DUNN, minors by

their guardian ad litem L. L. ROBERTS; HOWARD JOHNSON; and DEREK WILLIAM LANE and NICK ALVIN LANE, minors by their guardian ad litem JAMES W. LANE, and JAMES W. LANE, MARY LYNNE KING KNOTTS

PLAINTIFFS

vs.

THE UNITED STATES OF AMERICA

DEFENDANT

CIVIL NO. W–5010

D. W. FAHRBACH and RUTH E. FAHRBACH, Administrators of the Estate of Carl G. Fahrbach, Deceased; TOMMIE GROOMS, Conservator of Nancy Lee Grooms and Eric Grooms, minors, and TOMMIE GROOMS, Administrator of the Estates of John W. and Etta Mae Grooms, Deceased; DOROTHY F. HARRISON, Administratrix of the Estate of Martin E. Harrison, Deceased; LOUIS CHARLES KIMMEL, Administrator of the Estate of Mallory William Kimmel, Deceased; MARY LYNN KING KNOTT and CLIFFORD KING, Conservators of Gary Ray King, Terri Ann King, Lori Lou King, Lisa Kay King, Juli Jan King, and Dina Sue King, minors; and ARVEL SMITH, Administrator of the Estates of Ben Wilson and Helen Kimmel Wilson, Deceased

PLAINTIFFS

vs.

THE UNITED STATES OF AMERICA

DEFENDANT

## APPENDIX II

### FEDERAL AVIATION AGENCY
Washington, D.C.

ORDER 1000.9A
 5/29/67

SUBJ: COMPLIANCE AND ENFORCEMENT POLICY

1. *PURPOSE.* This order sets forth the agency policy with respect to obtaining compliance with rules and regulations promulgated by the FAA to promote aviation safety and the handling of reports of violations of such rules and regulations and actions taken on the basis of the investigation of such reports.

2. *CANCELLATION.* Order 1000.9, dated March 14, 1965.

3. *GENERAL POLICY.* The principal objective of the FAA compliance and enforcement program is to promote aviation safety and protect the public interest by obtaining compliance with the Federal Aviation Act and regulations issued thereunder. In pursuing this objective, the decision as to what constitutes the best remedial action in each case shall be made at the lowest operational level and within the framework of the procedures outlined below. Agency actions, from investigation to disposition, must insure fair and equal treatment for everyone. This requires each FAA employee to approach his work objectively and to pursue each step of the process without delay. Also, consideration must be given to the fact that those who carry persons or property by aircraft for compensation or hire have a duty to perform their services with the highest possible degree of safety.

4. *PROCEDURES.* The compliance/enforcement program will consist of two basic actions, administrative action and legal enforcement action.

 a. *Administrative Action.* Such action may be taken in lieu of legal enforcement action when it is determined to be the most appropriate means of obtaining compliance. The decision will be made by Flight Standards, at the lowest level appropriate to the violation involved. Such action may consist of the issuance of one of the following:

 (1) Safety Compliance Notice, including a reprimand to the violator if appropriate.

 (2) Letter of Correction, confirming discussions, and corrective action agreed upon as acceptable to the FAA.

 b. *Legal Enforcement Action.*

 (1) When it is determined by Flight Standards that formal legal enforcement actions; i. e., civil penalty or certificate action, is necessary, a report, FAA Form 430 (RIS: FS 8030–1), will be filed and processed through the appropriate regional/area Flight Standards Office and forwarded to the regional/area counsel. Field personnel will recommend either civil penalty or certificate action.

 (2) The recommendation should not be made in terms of specific dollar amounts in civil penalties or specific number of days in cases of suspension or revocation, but adequate information concerning mitigating or aggravating circumstances and background of the airman or operator involved must be provided.

5. *RESPONSIBILITY.*

 a. *Investigation.* It is the responsibility of Flight Standards inspectors to conduct appropriate investigations of all known or reported violations of the regulations.

 b. *Determination of Type of Remedial Action.* It is the responsibility of the lowest operational level of Flight Standards, appropriate to the violation involved, to make the decision as to whether compliance may best be obtained through administrative action or through legal enforcement procedures.

 c. *Determination of Legal Enforcement Action.* The determination of the specific type of action to be initiated will be the product of a joint determination by regional/area Flight Standards and legal counsel.

 d. *Legal Handling.* It is the responsibility of the regional/area counsel to undertake all legal handling of safety enforcement cases.

 e. *Review.*

 (1) All actions undertaken by field personnel will be reviewed by area and/or regional headquarters to insure fair and equal treatment of aviation community and provide assurance that action taken will serve to promote safety and protect the public interest. Appropriate members of my staff will monitor regional enforcement procedures to insure consistent enforcement nationally, and will report to me any deficiencies or discrepancies.

 (2) I consider the Compliance and Enforcement program so important and sensitive as to require the Regional Directors and Area Managers to be personally informed on the stream of action and to review all major cases.

/s/ William F. McKee
Administrator

AGENCY HANDBOOK 8030.7A

FAA HANDBOOK

Compliance and Enforcement

Page 5, Chap. 2, Para. 13; 15:

13. *GENERAL PHILOSOPHY.* The intent of the agency enforcement program is to obtain compliance with the regulations and, as a major element of FAA programs, to achieve safety for those who fly, as well as to simultaneously fulfill our responsibilities to the public at large. To that end:

a. Alleged and/or actual violations observed or brought to the attention of FAA shall be investigated, reported, and closed out with appropriate administrative, legal or criminal enforcement action and made a matter of record;

b. Field inspectors will carefully assess all relevant facts in order to reach a fair determination of action to be taken. Mitigating or aggravating factors must be clearly spelled out in the appropriate report in order to properly support action taken or recommended;

c. The field inspector is in the challenging and unique situation of not only promoting, fostering, and encouraging aviation growth but also for obtaining compliance with the regulations. Although these responsibilities are somewhat divergent, they are also quite compatible and interrelated. It must be recognized that neither can exist effectively without the other.

15. *ENFORCEMENT APPROACH.*

a. Obtaining safety through compliance is more than just enforcement of the law. This facet of the inspector's job is accomplished, to a large degree, during the inspector's day-to-day work of surveillance as well as through counseling and advising the aviation community with whom he works. He must take all practical steps to prevent violations by fostering an atmosphere of compliance. Simultaneously, where a known area of noncompliance exists, he must take positive corrective action. He should work closely with the aviation community and gain its respect, yet not so closely as to adversely affect his decisions and enforcement actions.

b. In handling enforcement matters the agency must assure:

(1) PRECISE and THOROUGH investigations.

(2) FIRMNESS yet UNBIASED gathering and reporting of facts and circumstances.

(3) Appropriate consideration of special and/or mitigating circumstances.

(4) PROMPT INVESTIGATION, reporting and processing to final action. DELAYS may:

(a) Permit unsafe conditions to continue.

(b) Deemphasize the seriousness of a situation or strengthen the violator's position.

(c) Impose an unjustified hardship.

Page 6, Chap. 2, Para. 17:

17. *GENERAL GUIDELINES:* It is difficult, if not impossible, solely by a handbook to establish guidelines which will correctly categorize all infractions of the law so as to pinpoint the appropriate enforcement action. There is no fool proof mathematical formula. The ultimate decision must be the product of judgment and experience applied to the facts and circum-

stances of the individual case. The following guidelines should be considered as appropriate in each case:

a. *Was the violation inadvertent or deliberate?* Administrative enforcement action (Safety Compliance Notice or Letter of Correction) should not be used where the violation was willful or deliberate.

b. *What is the certificate holder's level of experience and responsibility?* This aspect should be carefully considered, bearing in mind that those who carry persons or property for compensation or hire have a duty to perform their services with a high degree of safety. For example, a private pilot who lands "gear up" on a solo flight might be given a Safety Compliance Notice or a Letter of Correction if the circumstances so dictate. Conversely, it is difficult to envision a similar situation where a commercial pilot carrying passengers for hire should not be subject to legal enforcement action rather than administrative action.

c. *What is the attitude of the person involved?* A first offense by an individual who indicates his understanding of and willingness to comply with the regulations could be handled by administrative action whereas another individual who has little regard for regulations, the rights of others or who is contemptuous of the rules should receive either a civil penalty or certificate action. An identified disposition of noncompliance generally warrants legal enforcement action.

d. *What hazard or lack of safety of others was created which should have been foreseen?* This aspect is probably one of the most difficult to assess. It is here that the investigating inspector may need to seek advice or guidance from others. Information available from Air Traffic personnel should be considered and included when appropriate as well as witness statements, etc. Even though an actual or potential hazard was created which should have been foreseen, a Letter of Correction may be used where the problem or discrepancy can be corrected by training.

e. *What action was taken by employer or other government authority?* In many instances, these may result in the issuance of a Letter of Correction. In others, a legal sanction of a like duration and concurrent with a comparable action by the employer may be desirable. Such an instance would be where a crew member is removed from flying status by the company and the FAA imposes a retroactive suspension of his airman certificate for the same period. In these situations it must be understood that company action should be taken into account only to the extent that it is adequate—company action may not preclude additional FAA action if such is warranted.

f. *What kind of enforcement actions result from SWAP inspections?* There has been some misunderstanding concerning these actions. In instances where a Letter of Correction is considered appropriate as a result of a Systemworthiness Analysis Program (SWAP) inspection, it should be clearly understood that only those violations on which acceptable corrective action has been taken or proposed will be in such a letter. The SWAP inspection may very well identify unsafe actions or procedures which may warrant legal enforcement action. Any willful or deliberate violations such as falsification of records are considered in this latter category. During the SWAP debriefing session it is most important to explain to company officials these different actions and the reasons for taking them.

Page 19, Chap. 4, Para. 32:

32. *DETERMINATION OF REMEDIAL ACTION.* It is the responsibility of the lowest operational level of Flight Standards, appropriate to the violation involved, for determining whether compliance may best be obtained through

administrative enforcement action or through legal enforcement action. Inspectors should be encouraged to seek advice and counsel from their supervisors or Regional/Area Offices when there is any question or doubt as to the appropriateness of their recommendation. The lowest decision level will be as follows:

a. *AIR CARRIER*—(Air Carriers, Commercial Operators and their Employees.) The certificate-holding Principal Inspector, in coordination with the Supervising Inspector, determines whether administrative or legal enforcement action is appropriate, and is responsible for:

 (1) TAKING administrative enforcement action (except for Letter of Reprimand in which case the regional office is the responsible level); or

 (2) RECOMMENDING legal enforcement action, either civil penalty or certificate action (suspension or revocation) and, if appropriate, reexamination. He shall NOT specify dollar amounts or suspension periods.

 (a) The regional office determines the kind and severity of legal enforcement action.

b. *GENERAL AVIATION*—(Air Taxis, Air Agencies, Etc., and their Employees.) The certificate-holding Principal Inspector, in coordination with the Supervising Inspector, determines whether administrative or legal enforcement action is appropriate, and is responsible for:

 (1) TAKING administrative action (except for Letter of Reprimand in which case the Regional/Area Office having line jurisdiction over the district office is the responsible level); or

 (2) RECOMMENDING legal enforcement action, either civil penalty or certificate action (suspension or revocation) and, if appropriate, reexamination. He shall NOT specify dollar amounts or suspension periods.

 (a) The appropriate Region/Area Office determines the kind and severity of legal enforcement action.

c. *GENERAL AVIATION*—(Airmen). The Investigating Inspector, in coordination with the Supervising Inspector, in whose assigned area the violation was detected is responsible for:

 (1) TAKING administrative enforcement action (except for Letter of Reprimand in which case the appropriate Regional/Area Office is the responsible level); or

 (2) RECOMMENDING legal enforcement action, either civil penalty or certificate action (suspension or revocation) and, if appropriate, reexamination. He shall NOT specify dollar amounts or suspension periods.

 (a) The appropriate Regional/Area Office determines the kind and severity of legal enforcement action.

Page 21, Chap. 4, Para. 33:

33. *FINAL DETERMINATION OF LEGAL ENFORCEMENT ACTION.* The final legal enforcement action to be taken (kind and severity of sanction) will be a product of a joint determination by appropriate Regional/Area Flight Standards personnel and Regional Legal Counsel representatives. Agency Handbook 2150.2 prescribed policy and guidelines for the handling of legal aspects of FAA's enforcement program.

**420**

CHAPTER 2. POLICY, OBJECTIVES AND RESPONSIBILITIES

3. *ENFORCEMENT: A STATUTORY RESPONSIBILITY.* Enforcement of the regulations of the FAA is a responsibility assigned to the Administrator by the Congress of the United States. It is not a task which he pursues at his discretion. The Federal Aviation Act of 1958 specifically charges the Administrator with the responsibility of regulating both civil and military operations in the airspace in the interest of safety. It is also the Administrator's responsibility to perform his duties under the Act in a manner which will best tend to reduce or eliminate the possibility of or recurrence of accidents in air transportation.

To carry out this responsibility, the Administrator has been given specific authority to enforce the safety and security provisions of the Act and all rules, regulations or orders issued thereunder. Under Section 609 of the Act, the Administrator, if he determines that safety in air commerce or air transportation and the public interest requires, may issue an order amending, modifying, suspending or revoking certificates. Section 901 of the Act provides for the imposition of a civil penalty of $1,000 for each violation and authorizes the Administrator to compromise any civil penalty to which a violator may be subject as a result of violations of Titles III, V, VI, or VII of the Act. In addition, the Administrator is empowered to apply to the United States District Court for the enforcement of any provision of the Act under which he has jurisdiction.

5. *ENFORCEMENT RESPONSIBILITIES.*

a. *Flight Standards District Offices—Investigation, Reporting and Processing.* The Flight Standards Service has the sole and ultimate responsibility for conducting prompt investigations and reporting violations, including the gathering and submission of all evidentiary material. This task is for the most part the responsibility of the many FSS District Offices. The District Offices are also responsible for taking administrative action against violators when they conclude that such action is appropriate. In accomplishing these tasks, the Flight Standards Service may call upon the other Services for such help as may be required. They are particularly encouraged to utilize the services of the General Counsel's and Regional Counsel's offices. Such help should be provided upon request.

b. *Flight Standards' Analysis of Safety Implications.* In those cases which are being processed for legal enforcement action, using the reporting inspector's analysis and recommendations, Flight Standards is responsible for an independent analysis of the facts and safety impact of each violation. Flight Standards is responsible for submitting a complete report to Counsel, including a technical analysis and recommendaton for the action required in the public interest.

c. *Flight Standards and Counsel—Selection of Sanction.* In cases being processed for legal enforcement action, sanctions imposed by Counsel will be the product of joint decision between Flight Standards and Counsel. If the sanction recommended by Flight Standards is concurred in by Counsel, he will immediately process the violation report. If Counsel does not concur in the Flight Standards recommendation, he shall consult with Flight Standards and attempt to reach agreement. If agreement does not prove to be possible, the matter shall be referred to the Regional Director who will make the final determination after consultation with the Office of the General Counsel.